UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **MELISSA HELEN FLEAGLE,** )<br> )<br>**Plaintiff,** )<br> )<br>v. )<br> )<br>**KILOLO KIJAKAZI, Acting** )<br>**Commissioner of the Social Security** )<br>**Administration,** )<br> )<br>**Defendant.** )<br> ) | Civil Action Number<br>**2:21-cv-00357-AKK** |

## MEMORANDUM OPINION

Melissa Helen Fleagle seeks review of the decision of the Acting Commissioner of the Social Security Administration denying benefits. Doc. 1. Fleagle maintains that the Administrative Law Judge who adjudicated her case failed to account for her fibromyalgia-related limitations, and especially her fatigue, in determining her residual functional capacity. Doc. 14 at 4. Fleagle also challenges the ALJ's decision on constitutional grounds. *See id.* However, as explained herein, the court must affirm the ALJ's decision because the ALJ properly considered Fleagle's fibromyalgia, and the Acting Commissioner's allegedly unconstitutional removal protection does not require remand.

**I.**

Fleagle previously worked as a school adjustment counselor before she applied for disability benefits in 2019 based on fibromyalgia, migraines, Sjogren's

syndrome, restless leg syndrome, and possible partial seizures. *See* docs. 14 at 5; 15 at 2; R. 16. After the SSA denied her claims, Fleagle, her attorney, and a vocational expert appeared at a telephone hearing before an ALJ, who concluded that Fleagle was not disabled. *See* R. 16–17. The Appeals Council denied review, R. 1, and the ALJ's decision subsequently became the final decision of the Acting Commissioner. Fleagle's appeal followed. Doc. 1.

## II.

On review, the court may decide only whether the record contains substantial evidence to support the ALJ's decision and the ALJ applied the correct legal principles. 42 U.S.C. § 405(g); *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020). Courts review de novo the legal conclusions upon which the Commissioner's decision is based, while the Commissioner's factual findings are conclusive if supported by "substantial evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence refers to "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* This threshold "is not high," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), and requires "less than a preponderance," *Moore*, 405 F.3d at 1211. If substantial evidence supports these findings, the court must affirm, even if the evidence preponderates against them. *Noble*, 963 F.3d at 1323.

When determining whether substantial evidence exists, the court cannot decide the facts anew, reweigh the evidence, or substitute its judgment for the Commissioner's. *Id.*; *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The court also cannot automatically affirm the decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988). Instead, the court "retain[s] an important duty to 'scrutinize the record as a whole' and determine whether the agency's decision was reasonable." *Simon v. Comm'r of Soc. Sec.*, 7 F.4th 1094, 1104 (11th Cir. 2021) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).

### III.

The Social Security Act "places a very heavy initial burden on the claimant to establish existence of a disability by proving that he is unable to perform his previous work." *Bloodsworth*, 703 F.2d at 1240. In fact, "[t]his stringent burden has been characterized as bordering on the unrealistic." *Id.* (collecting cases). A claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 416(i)(1). An ALJ must determine:

   (1) whether the claimant is currently unemployed;
   (2) whether the claimant has a severe impairment;
   (3) whether the impairment meets or equals one listed by the Commissioner;

3

(4) whether the claimant is unable to perform his or her past work; and
(5) whether the claimant is unable to perform any work in the national economy.

20 C.F.R. § 404.1520(a); *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *McDaniel*, 800 F.2d at 1030 (citing 20 C.F.R. § 416.920(a)-(f)). If a claimant's impairments do not meet or equal a listed impairment at Step Three, the ALJ determines the claimant's "residual functional capacity" based on all of the relevant evidence. 20 C.F.R. § 404.1520(e). A residual functional capacity is "the most [the claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1).

For claims filed after March 27, 2017, as here, the ALJ will not defer or give any specific weight to medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(a). Rather, to determine the persuasiveness of a medical opinion or prior administrative finding in the record, the ALJ focuses on factors that include supportability, consistency, the medical source's relationship with the claimant, and the medical source's specialization. *Id.* § 404.1520c(c). The most important factors are supportability and consistency. *Id.* § 404.1520c(a).

Further, when a claimant provides testimony concerning her or his subjective symptoms, the ALJ must determine whether there exists "(1) evidence of an

4

underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the record shows the claimant has a "medically determinable impairment that could reasonably be expected to produce her symptoms," the ALJ must assess the "intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work" in light of the objective medical evidence and statements by the claimant and their doctors.  *See Costigan v. Comm'r of Soc. Sec.*, 603 F. App'x 783, 786 (11th Cir. 2015) (citing 20 C.F.R. § 404.1529(c)(1)).

The ALJ must also examine the claimant's testimony in relation to the other evidence to ascertain whether there are any "inconsistencies or conflicts between those statements and the record."  *Id.*  If the ALJ subsequently discredits the claimant's testimony, the ALJ must "articulate explicit and adequate reasons for doing so"; the failure to articulate reasons "requires, as a matter of law, that the testimony be accepted as true."  *Wilson*, 284 F.3d at 1225 (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).  Taken together, the court "will not disturb a clearly articulated credibility finding supported by substantial evidence."  *Mitchell*, 771 F.3d at 782 (internal citations omitted).

**IV.**

In this case, at Step One, the ALJ determined that Fleagle had not engaged in substantial gainful activity since March 1, 2019, her alleged onset date. R. 18. At Step Two, the ALJ found that Fleagle suffered from the severe impairments of "Sjogren's syndrome/ANA positive arthralgia, fibromyalgia, and obesity" and nonsevere impairments that included possible complex partial seizures, restless leg syndrome, and migraine headaches. R. 19. The ALJ also noted Fleagle's possible "non-severe neurocognitive disorder" but concluded that it did not significantly limit her ability to perform basic mental work activities. R. 22. At Step Three, the ALJ found that Fleagle did not have an impairment or combination of impairments that met or medically equaled a listed impairment. R. 23. Thus, the ALJ proceeded to evaluate Fleagle's residual functional capacity by considering her testimony, self-reports, medical evidence, and opinions from her doctors and evaluators. *See* R. 25.

In Fleagle's function report, Fleagle indicated that her conditions affected her ability to lift, squat, bend, stand, walk, climb stairs, remember, and concentrate. R. 204. As for her daily activities, Fleagle reported that she cared for her pets, prepared simple, non-hot meals, performed some laundry and small household tasks, drove, shopped, and handled finances. *See* R. 200–03. She emphasized that she experienced fatigue and pain, describing that "long periods of walking or standing" and climbing stairs "increase[d] [her] pain and fatigue" and that this fatigue, in turn,

affected her memory and concentration. R. 204. At the hearing, Fleagle testified that "severe fatigue" hindered her from working, her fatigue persisted despite rest and medicine, and she relied on her spouse for household tasks. R. 48–49; R. 55.

The ALJ credited this testimony as indicating that Fleagle experienced "medically determinable impairments [that] could reasonably be expected to cause some symptoms and functional limitations." R. 26. However, the ALJ found that Fleagle's testimony "[was] inconsistent with the objective medical evidence, [her] treatment regimen and response to treatment, and [her] daily activities." *Id.* Here, the ALJ recounted the medical records from Dr. John Riser, Fleagle's neurologist, and Dr. Joel Abbott, Fleagle's rheumatologist. *See id.* Fleagle visited Dr. Riser for partial seizure disorder, migraines, and restless leg syndrome, *see* R. 491–538, and she does not challenge the ALJ's decision as to these conditions. Rather, her appeal focuses on her fibromyalgia, for which she mostly visited Dr. Abbott. *See, e.g.*, doc. 14 at 10–11. The court summarizes only the records from Dr. Abbott.

Around her alleged onset date in March 2019, Fleagle visited Dr. Abbott for Sjogren's syndrome, ANA positive arthralgias, fibromyalgia, and fatigue, among other conditions. *See* R. 401. Fleagle reported "brain fog," fatigue, and pain in her knees, thighs, and torso. *Id.* Dr. Abbott continued Fleagle's regimen of gabapentin, Methotrexate, Plaquenil, prednisone, omeprazole, Savella, folic acid, cyclobenzaprine, Celebrex, and Ultram, although he ultimately ceased the

prednisone. *See* R. 401–03. At a follow-up visit two months later, Fleagle reported "improving but persistent musculoskeletal symptoms" and said that though the brain fog, pain, and "achiness in [her] thighs" had improved, she continued to experience pain and weakness in her knees, ankles, and back and "increased fatigue." R. 397. Dr. Abbott wrote that Fleagle's "[a]ctivities of daily living [were] executed without difficulty," and he continued Fleagle's drug therapy and increased her folic acid and Naltrexone. R. 397–99.

At a July 2019 follow-up visit, Fleagle reported "improving musculoskeletal symptoms" but complained of worsening fatigue. R. 425. Dr. Abbott again wrote that Fleagle's daily activities were "executed without difficulty" and removed Methotrexate from Fleagle's medicine regimen apparently due to the side effects she was experiencing. *Id.* Fleagle returned in November 2019 and reported that she had had "stable musculoskeletal symptoms in the interim." R. 473. Fleagle described "pain in the thighs, right shoulder[,] and right thumb," and Dr. Abbott again noted that her daily activities were executed "without difficulty" and continued her medicines. R. 473–74.

In February 2020, Dr. Abbott recorded similar findings, including "stable musculoskeletal symptoms" and the execution of daily activities without difficulty. *See* R. 545. Dr. Abbott also recorded that Fleagle experienced continuing, significant fatigue, including after walking for exercise. *Id.* Several months later,

8

Fleagle reported that "[h]er fatigue in the last [one] week [was] better than previous" and that "[s]he had [had] a few rough weeks prior to that." R. 553. Dr. Abbott otherwise recorded similar findings again. *See id.*

Based on these records, the ALJ concluded that Fleagle's condition had improved by May 2019 and that she had been able to execute her activities of daily living without difficulty and with partially effective, well-tolerated medicine. *See* R. 28. Consequently, the ALJ found that Dr. Abbott's medical records undermined Fleagle's allegation that she could not work consistently for a 40-hour work week. *See id.* The ALJ also noted that Fleagle's daily activities, such as caring for pets, preparing meals, doing laundry, shopping, and handling finances, "[were] not consistent with disabling symptoms or limitations." *Id.*

The ALJ also compared Dr. Abbott's medical records with his 2019 and 2020 signed statements in which Dr. Abbott wrote that Fleagle was "totally and permanently disabled . . . due to worsening musculoskeletal symptoms." *See* R. 30 (citing, *e.g.*, R. 649; R. 698). The ALJ concluded that these forms and statements "[were] not consistent with [Dr. Abbott's] longitudinal treating source medical records" because the records "[did] not document such severe pain and fatigue as described," including frequent flare-ups or worsening symptoms. *See id.* The ALJ also noted that although Dr. Abbott signed a statement in June 2019 indicating that Fleagle could not perform "minimum sedentary activity" and had a severe limitation,

*see* R. 651, Dr. Abbott's records noted that "activities of daily living were executed without difficulty." R. 30. In total, the ALJ determined that Fleagle's medical records conflicted with "a finding that [she] . . . had disabling fatigue or disabling musculoskeletal symptoms." R. 31.

As a result, and after considering other opinions provided by the Disability Determination Service, the ALJ concluded that Fleagle had the residual functional capacity to perform a "range of light work, which reasonably account[ed] for all of [her] medically documented impairments, and [was] consistent with, and supported by [her] longitudinal medical treatment records." R. 31–32. Using this RFC, at Step Four, the ALJ found that Fleagle could perform her past work as a school adjustment counselor, which was performed at a light level of physical exertion. R. 32. The ALJ also found at Step Five that Fleagle could work as a cashier, information clerk, or office helper. R. 33. As a result, the ALJ concluded that Fleagle was not disabled. R. 34.

## V.

Fleagle challenges the ALJ's decision for allegedly failing to fully account for the limitations she experienced as a result of her fibromyalgia, especially pain and fatigue. Doc. 14. Fleagle also argues that then-Commissioner Andrew Saul's for-cause removal protection violated separation-of-powers principles and requires remand. *See id.*

10

A.

Fleagle says that the ALJ did not fully consider her fibromyalgia-related fatigue and pain, as documented by Dr. Abbott, and thus failed to follow Social Security Ruling 12-2p, the regulation for evaluating fibromyalgia. *See* doc. 14 at 8. Her argument implicates two related issues: first, whether the ALJ properly evaluated Dr. Abbott's records and opinions, and second, whether the ALJ considered Fleagle's fibromyalgia in accordance with Ruling 12-2p.

For claims filed after March 2017, like Fleagle's, the ALJ does not give specific or controlling weight to prior medical opinions; rather, the ALJ considers each opinion's supportability and consistency to determine its persuasiveness. 20 C.F.R. §§ 404.1520c(a)-(c). Here, the ALJ concluded that Dr. Abbott's findings about Fleagle's permanent disability status and the extent of her limitations were not supported by his own medical records, which indicated continuing fatigue but also stable or improving musculoskeletal symptoms and that Fleagle could perform her daily activities "without difficulty." *See* R. 30–31. Fleagle acknowledges these notes in her records from Dr. Abbott, and although she contends that the ALJ ignored her fatigue, *see, e.g.*, doc. 14 at 12–14, the ALJ did mention it when recounting her testimony and comparing Dr. Abbott's observations and conclusions to determine Fleagle's residual functional capacity, *see* R. 20; R. 27–28; R. 30–32. Although Fleagle contends that the ALJ failed to "fully consider[] the impact of her fatigue,"

11

her argument primarily underscores her belief that the ALJ should have considered this symptom more explicitly when discussing Fleagle's fibromyalgia. *See* doc. 14 at 20. But the ALJ did consider it, and the court cannot reverse the ALJ's decision on this ground.

In reaching this conclusion, the court does not intend to dismiss Fleagle's testimony about her fibromyalgia, which she said affected her ability to "have a 'normal' life, wake up refreshed, have a day without fatigue or pain," and sustain employment. *See* R. 200. But the court's role in this context is limited to determining whether the ALJ's evaluations of the evidence and subsequent decision not to rely on certain of Dr. Abbott's opinions are supported by "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *See Moore*, 405 F.3d at 1211. Further, the court cannot reweigh the medical records and substitute its own judgment about Fleagle's fibromyalgia and fatigue in place of the ALJ's. *See Noble*, 963 F.3d at 1323. The ALJ articulated why he did not credit Dr. Abbott's opinion about the extent of Fleagle's limitations by referring to conflicting observations in Fleagle's medical records, including notes that Dr. Abbott made during her visits, *see* 20 C.F.R. § 404.1520c(c), and the ALJ relied on apparent discrepancies between Fleagle's testimony, self-report, and allegations to

bolster his findings, *see* 20 C.F.R. § 404.1529(c)(1); *Costigan*, 603 F. App'x at 786. As a result, the court cannot disturb the ALJ's decision on this ground.[1]

Fleagle also argues that, as explained in Ruling 12-2p, "fibromyalgia has a waxing and waning nature that *must* be considered [and] which the ALJ did not do." Doc. 14 at 19–20 (emphasis in original). Fleagle correctly observes that Ruling 12-2p describes the symptoms of fibromyalgia as "wax[ing] and wan[ing] so that a person may have 'bad days and good days.'" *See* 77 FED. REG. 43,644. But Ruling 12-2p states that this fluctuating nature means ALJs "will consider a longitudinal record whenever possible," *id.*, which is what the ALJ did, *see, e.g.*, R. 26–28. In short, the ALJ considered the extent of the medical records documenting Fleagle's fibromyalgia starting from her alleged onset date, expressly mentioning that these records were longitudinal, that they indicated some improvement but continued fatigue, and that he evaluated them in accordance with Ruling 12-2p. Because

---

[1] The court appreciates Fleagle's argument that although Dr. Abbott consistently reported that she could execute daily activities "without difficulty," Fleagle averred that the scope of these activities was limited by her fatigue. *See* doc. 18 at 3–4. However, the ALJ could still properly discount Dr. Abbott's opinions about Fleagle's disability status by citing apparent discrepancies between these opinions, the treatment records, and Fleagle's self-reported activities while partially crediting Fleagle's testimony that her fatigue limited or slowed those activities. *See Crow v. Comm'r, Soc. Sec. Admin.*, 571 F. App'x 802, 806–07 (11th Cir. 2014). *See also* doc. 15 at 11 (listing the discrepancies between Dr. Abbott's statements and his records, as identified by the ALJ). Additionally, the ALJ deemed "somewhat persuasive" the opinions of the state-agency consultants who considered Fleagle's fatigue and determined that she could still perform light work, which the ALJ considered "consistent with and supported by [Fleagle's] longitudinal treating source medical records through the relevant period." R. 31–32; *see, e.g.*, R. 86–87. In other words, the ALJ properly supported his determinations by articulating the persuasiveness of the opinions in Fleagle's record against the backdrop of the longitudinal medical evidence.

Fleagle does not identify any specific errors with respect to this part of the ALJ's analysis, the court cannot disturb this determination, either.

B.

Fleagle also asserts that during the adjudication of her case, "Commissioner Saul was not removable at will" under 42 U.S.C. § 902(a)(3), and because "the Appeals Council decision was not reviewable by anyone subject to Presidential at-will removal, it is void" from a constitutional perspective. *See* doc. 14 at 22–23. For its part, the SSA agrees that § 902(a)(3) violates separation-of-powers principles by limiting the President's authority to remove the Commissioner without cause. *See* doc. 15 at 12–13. However, in the SSA's view, Fleagle has not shown the requisite harm to require remand. *See id.*

Assuming without deciding the constitutional infirmity, a removal provision such as § 902(a)(3) is "severable from the other statutory provisions bearing on [an agency's] authority," meaning that "[t]he agency may therefore continue to operate." *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2192 (2020); *Jordan v. Comm'r of Soc. Sec. Admin.*, No. CV-21-08022-PCT-DGC, 2022 WL 842902, at *2 (D. Ariz. Mar. 22, 2022) (applying *Seila Law* to § 902(a)(3)). For example, with respect to the Federal Housing Finance Agency, the Supreme Court indicated that the unlawfulness of a removal provision "[did] not strip the Director of the power to undertake the other responsibilities of his office." *Collins v. Yellen*,

14

141 S. Ct. 1761, 1788 n.23 (2021).  This precedent illustrates that, contrary to Fleagle's argument, the removal protection afforded to then-Commissioner Saul did not pollute his authority to, for instance, issue regulations.  *See id.*; doc. 18 at 7.

To be sure, an unconstitutional removal provision can cause injury under certain circumstances.[2]  But Fleagle argues only that "[t]here is a strong possibility that [she] was among those wrongfully deprived of their due process rights through [then-Commissioner] Saul's politicization and undermining of disability benefits during his tenure," and so "[t]he government deprived [her] of a valid administrative adjudicatory process."  Doc. 18 at 9.  While Fleagle may disagree with the actions then-Commissioner Saul took and believe that they generally undermined the success of her disability claim, she does not supply evidence that Commissioner Saul played a specific and detrimental role in her claim.  *See Jordan*, 2022 WL 842902, at *2; *Vergara v. Kijakazi*, No. 20-22964-Civ-WILLIAMS/TORRES, 2022 WL 769704, at *8 (S.D. Fla. Feb. 23, 2022).  Fleagle does not make further arguments on this point, and her thesis would seem to dictate that "the mass of SSA decisions—which [do] not concern the President at all—would need to be undone" due to the removal provision—a doubtful conclusion.  *See Collins*, 141 S. Ct. at 1802 (Kagan,

---

[2] *E.g.*, where the President "ma[kes] a public statement expressing displeasure with actions taken by [an officer] and ha[s] asserted that he would remove the [officer] if the statute did not stand in the way."  *Collins*, 141 S. Ct. at 1789.  *See also id.* at 1801 (Kagan, J., concurring) ("[P]laintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head affected the complained-of decision.").

J., concurring). Thus, Fleagle fails to demonstrate that § 902(a)(3), if unconstitutional, requires remand.

## VI.

In conclusion, the court will affirm the ALJ's decision because it is supported by substantial evidence and because § 902(a)(3)'s purported infirmity does not warrant remand. A separate order follows.

**DONE** the 21st day of July, 2022.

*Abdul Kallon*
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE